Good morning, Your Honor. Tom Edwards for the appellate. Societe Kamel Bekdache & Fils, and I'm going to just refer to them as SKB. SKB, that's good. Good old American initials. Good old American initials. Based on the concessions which my learned opponent has made in his brief, there really is just one issue here. The question is whether the force majeure clause excused performance of the contracts that were still outstanding when the Jin Rui Group decided to go out of business. The ultimate manufacturer of the ballpaper here is a company called Shandong in China. The chairman of the company is the father-in-law of Mr. Wen, who is the president and owner of the Jin Rui Group. They were distributors for Shandong. My client purchased paper from them for sale in the Middle East. In May of 2011, Jin Rui Group announced that it was going out of business because Mr. Wen's father-in-law had decided that he would rather handle sales in-house at Shandong. The district court held that that was sufficient to excuse performance under the force majeure clause, and we think that's just wrong as a matter of law. So they entered into a contract with your client, not having a contract of their own to back it. Is that what the situation was? Jin Rui had a contract with my client, but it didn't have a contract with its own supplier. Jin Rui did not have a contract with its own supplier, didn't have a distributorship agreement. And was the contract with your client, did it specify that it had to be this particular paper? No. Well, it was obviously intended to be the paper from Shandong. That's what they were purchasing, but the argument that the paper was unique is ridiculous. Was there anything in the record to rebut that? There's testimony in the record that the paper from Shandong was unique, so therefore there wouldn't have been a possibility to mitigate. Was there evidence in the record that that was not correct? There was no evidence that it was unique. Well, there's testimony that it was, that there wouldn't have been a replacement. No, Your Honor, it wasn't that specific. The testimony was that the customers expected paper of a certain quality, which of course you... And then the question was, could they substitute that order to another mill and expect to receive the same type and quality of paper? And the answer was no. And so, and then there was a question about the only way to mitigate is to get production from the same mill. So was there testimony that that was not correct, that your client, SKB, would have accepted paper from a range of mills? Just common sense, Your Honor. Okay, so nothing in the record, just common sense, which we don't have a lot of. No, no evidence, no evidence that, that there was no evidence that customers, that it could not have been possible to obtain paper of equal quality elsewhere. It's bulk paper used for... So you didn't, your client didn't present any evidence to that effect? No, we did not. Okay. And the, I think the literal testimony was simply that customers accepted paper of a certain quality, which we would stipulate to that, but... But then he says, and they couldn't receive it from another mill. And he says no. So that's the testimony. Just a statement of opinion by Mr. Winn. But he, there was no testimony that he made any attempt to find paper of another, of equivalent quality to replace the paper that he was contractually obligated to provide. No testimony that it would have been impossible to do that. He made no attempt. So you, so his testimony that it was not possible to substitute, I mean, that's the only evidence that was before the district court. That one isolated statement is the only evidence whatsoever on that point. And there was no evidence that he made any attempt. There was also testimony that he couldn't get a contract with his father-in-law because it was his father-in-law and because of Chinese customs. Was there any evidence in the record that it would have been possible to get a contract and that wouldn't have been like an expert saying in family dynamics, this happens all the time you have a contract or it's not really Chinese custom, it's very customary. Was there any, so again, common sense is what you're saying. No, there was no evidence to the contrary on that. I think it's more pertinent to look to the fact that he had no enforceable contracts with his father-in-law to provide the paper that he was obligated to. So he testified as to why he had no enforceable contract. I guess my concern here is the district court made a finding that, I mean, it's one sentence, that Shandong decided to terminate its relationship and as a result, JRG was forced to close its operations. And so it seems that it was after a bench trial. So it seems as if reasonable minds could find that JRG was not able to satisfy the contract, then don't we have to defer to the district court's factual finding here? Well, the law, it's not, I don't think that you have to defer to the factual finding. It's a conclusion of law or a mixed conclusion of law and fact. So it's de novo. You don't have to defer here. The facts are undisputed. The question is whether these facts are, as a matter of law, sufficient to support the conclusion that the force majeure clause applies. And he was obligated to take reasonable steps to perform. You can't just say I'm unable to perform without showing that you took reasonable steps to perform. So is your theory that the district court erred by not making express findings about, so you're not arguing that? My theory is that as a matter of law, the facts in the record do not support the conclusion. So as a matter of law, JRG could have done something to satisfy the contract with SKB. And what case supports it as a matter of law, a company in JRG's position where its sole supplier shuts down isn't forced to close, as the district court said? I guess I'm struggling with what the legal principle is. His sole supplier didn't shut down. His sole supplier cut him off, right? Cut him off. It would be a different case if Shandong, for example, blew up. There was a fire. As a matter of law, the district court was wrong, and JRG was not forced to close its operation. Say that again? Are you saying that as a matter of law, JRG was not forced to close its operation? I'm saying as a matter of law, he did not take reasonable steps to perform the contract in this situation. He did not take reasonable steps before Shandong cut him off by having some kind of enforceable contract. He made no attempt to force it. I mean, he submitted orders. There is some kind of an agreement there. But he made no attempt to enforce those orders. He simply acquiesced in his father-in-law's decision not to fulfill the contract. And he made no—he says it would have been impossible to find alternative goods for bulk paper. We think as a matter of law, he was obligated to look for an alternative source of paper. Did he present evidence of efforts to find alternative paper? He says he made no effort to find— Did he proffer alternative papers, which your client rejected? No, he did not. No. And they've not suggested that they made any attempt to find any substitute goods. You've got about two minutes left. Okay.  Good morning, Your Honors. May it please the Court. Wayne Kesai on behalf of Jin Rui Group. Judge Ikuda made an excellent note about the uniqueness of this paper. And even though it's called bulk paper— Did your client try to proffer alternative paper, which the other side rejected? No, Your Honor. Why is that reasonable? My client— I mean, they have paper. They have a contract to fulfill. They can try to cover in the market and say, here, we've got this instead. Did they make any efforts to do that? No, Your Honor, and this is why. They are not a paper distributor. So what? They have a contract. They are under contractual obligation to provide paper. If there is a disruption in the supply line, they have a responsibility to try to come up with a substitute. What efforts did they make to show that this is—the product they had was unique? Everything else was unacceptable? Well, once again, Your Honor, they were not a distributor of paper. They were the export arm for sales for a particular company. I don't care if they were Captain Kangaroo. It doesn't matter what they were. The point is they were in the business of supplying paper, right? And when the paper supply becomes unavailable, not by fire, not by earthquake, not by sinking of a ship or anything like that, just the people they do business with say, you know, they don't have a contract with them, and they say we don't want to supply it anymore. Why isn't it up to them to make reasonable efforts to find a substitute? To say, you know, we can't provide this paper, but here is another paper. Is this acceptable? Why isn't that part of what being commercially reasonable, what is required to be commercially reasonable? That would certainly be commercially reasonable if Ginry Group had been a distributor of paper where they could go to different manufacturers and purchase their product and sell it to its customers. But they were not in that function. And so they couldn't go to another company and offer to buy paper? Well, legally they could, but that was not their function. They were set up as the export sales arm of a particular manufacturer of paper, and that was all that they were functioning as. They were not functioning as somebody... And so they are in the business, they are doing that, and without disclosing their customers, they don't have a contract. They don't have a contract to supply this thing that they're holding themselves out to be the distributor for. They don't have any legally enforceable law. Why is that reasonable? Why is that commercially reasonable to be in the business of entering into contracts and not yourself have a contract to ensure that supply will not be interrupted? Well, if they would have managed to have some sort of contractual relationship with basically Mr. Wen and his wife, they own Ginry Group, basically with Mr. Wen's father-in-law and her father, they would not have been in business because they never would have agreed to that type of relationship. It's a family situation. Well, that's too bad. Then they shouldn't have been in business. But being in business without having a contract to back up your supply, you hold yourself out as a supplier and you don't have a contract for whatever reason, you don't have a supplier, why isn't that commercially unreasonable? I've never heard of a arrangement like this. In this situation, first of all... Did they tell their people that they were doing businesses, by the way, we don't have a contract, it's up to the father-in-law, and if the father-in-law decides to cut us off, it's too darn bad. Was that disclosed? Well, they understood that there was... Was that disclosed? Not that they could cut them off, but the fact that there was a family relationship and this is why they were handling sales for that manufacturer. That was disclosed. But I imagine it was disclosed in the context of we can get you a really good deal because we're buddies with the father-in-law, not the father-in-law changes his mind, sorry. Correct, but this is actually even better. If you look at the situation, what would you rather have if you're an American company? Would you want to try to sue a manufacturer in China to enforce a contract? Or would you say, look, that's my father and that's my father-in-law, and if anyone's going to do something right by us, he's going to do it because, you know, in one case it's my father-in-law and in the other case it's my father. I mean that, to me, especially within the context of an Asian family, that is stronger than any contract. And trying to enforce some sort of contract in a court in China, I think that'd be evil. It wouldn't have been the buyer that would have to enforce a contract in China. It would have been your client. Correct. And if you don't have a contract, you need to disclose it. You say, well, you know, this is a family business. We don't really have a contract, but we can get you a good deal. But there's no guarantee that they will come up with it. They can cut us off at any time. Was anything like that disclosed? As far as I don't think that they discussed the issue about whether they could cut them off, but it was fairly— This is force majeure. This is force majeure. I've never seen—you know, this is a contract. This is a doctrine in California law. I've never seen anything force majeure like this. Are you saying that your client couldn't have, had he had a contract with the other company, Shandong, would not have been able to enforce the contract in China? I believe in a practical matter, absolutely that would be correct. That he could or could not enforce it. That he could not be able to enforce it effectively in China, as well as the fact that I don't think— I'm sorry. This is based on your personal knowledge? Is there something in the record? Is there something in the record that says if it had a contract, we couldn't have enforced it? Well, I think historically it's pretty clear that in China, the way that they enforce their laws are completely different. Did you hear my question? Yes, Your Honor. This is based on your personal knowledge? Correct. Not anything in the record? It's not based on anything in the record. That's correct. Except for the fact that my client said having this family relationship is better than a contract, which is in the record. I'm sorry? Which is in the record. That's his personal view, that it's better. Was there testimony about what's commercially reasonable? Was there anything that was presented by SKB or by your client about what would be commercially reasonable with respect to his relationship with Shandong? No, Your Honor. There was nothing like that. SKB didn't put in anything about what was commercially reasonable? No, Your Honor. Counsel, I'm sorry. Finish your answer. And the issue here about the paper, it was actually the testimony of SKB's chief executive that this paper was unique to this mill, and that was why he was trying to purchase that paper. And that's why it was not replaceable by Jin Rui Group. Had it wanted to go into the open market and try to buy a replacement paper, it couldn't do it. If I could, I'm just finished remodeling my house, so I want to understand, use that as an example for force majeure. If I hire someone to build stairs in my home, and I sign a contract with them, and they say for way too much money they're going to build my staircase for me, and then they start construction, and then one day the son of this family business comes in and says, you know what, my dad, we had a fight, and he won't let me have my tools anymore. So I'm sorry, I can't build your stairs. Under your reading of force majeure, am I stuck with a half-built staircase? No, I would say that that would not be the case. And why is my situation different than the one? I'll say they're Asian stair builders, so we can make that the same. Yeah, in my situation, at the very inception of the relationship, my client, Jin Rui Group, is telling SKB, look, we're acting as the export sales arm for this specific manufacturer. All right, same thing for mine. The son says, you know what, my dad is the master stair builder, I'm kind of the sales guy, I speak English better than he does, so I can get you a great deal because my dad is the master stair builder. Well, if he's saying that, and he says he's depending on the father to do the work, and then the father comes in later and says he cannot do the work. Then I'm just out of luck. Then I think that force majeure is proper. Okay. And you don't think that at that point he has to find some other stair builder with tools to fill in and finish the job? I think to the extent that's possible, that's certainly something that he should be doing. But that's not the situation here, where somebody's functioning as the export sales arm for a specific manufacturer. And you have something here saying this is not possible. It does say that this company is the export sales arm. No, no, but it is not possible. There's something in the record saying substituting something else is not possible. There is that in the record where it's SKB's chief executive that says this paper is unique, and he can't get it anywhere else. That was the testimony that Judge Ikuda referred to, and it wasn't my client's testimony. This is SKB's testimony. So if the stair maker for Judge Owens was a master craftsman who did unique work and then decides not to do it, I guess Judge Owens is out of luck? Yes. There's plenty of areas of stair builders. That's correct. I mean, if that's what you're relying on. He wouldn't be required to go and find Guarini and get him to finish the stairs. To the extent that they can find someone that can do the same work? I don't understand why there isn't a part of a commercial reasonableness isn't making an effort, trying, you know, you try and then you fail. It's a different situation. But why isn't the effort to try to complete the contract part of the commercial reasonableness? Because for this company, that's not what they were in the business of doing. That's the key. They were in the business of doing what they were doing until Grandpa said no more. And at that point, the business changes. At that point, you have responsibilities. I mean, you don't have to do new contracts. At that point, you can stop taking on new contracts. But there's existing contracts. I don't understand why they aren't responsible for trying to fill the order some other way. If the other side says, no, this is unacceptable, then you're in a different situation. Then you're saying, well, this is unacceptable. Then, you know, we tried. Maybe you can rely on force majeure. But it's nothing like that. Anyway, you're way over time. Thank you. I think you had a little time left. This is a—oops. Are you okay? I'm fine. Stuff slid out of my notebook. You disappeared behind the podium for a second. Everything fell out of my notebook. You were trying to cover. This version of force majeure is force majeure. If this were the rule, if you could get away with this, you could set up—if you were Shandong, you set up your son-in-law to be your distributor. If you want to honor your contracts, you can. If you want to walk away from— There's nothing wrong with any of that if it's disclosed up front, saying, well, this is our relationship, and this is the change you're taking. Right. But what about that statement that opposing counsel mentioned, that Jakuto mentioned, where your client said this is unique? I don't believe that's in the record. I believe there was testimony in terms of the proof of—he didn't cite you in the record. There's no such statement in the record. I just read it, so I guess I can find it again in here somewhere. And if a customer who ordered paper from you wanted to purchase some paper, would they have a certain expectation as far as the quality and nature of that paper? Answer, yes, correct. And could they substitute that order to another mail and expect to receive the same type and quality of paper? Answer, no. I think that's testimony from Mr. Wynn, isn't it, not from SKB? Well, my notes don't say who the— It says—no, I don't have the— I believe that's testimony from the president of Genrui. And, again, we would agree that paper must be of a certain quality, but there was no evidence that you couldn't have obtained equivalent paper in the open market. And the fact that they chose to shut down their business rather than attempting to find alternative goods, it's not commercially reasonable. It can't be the law that you can walk away from the contract just because your supplier chooses not to perform, without doing more than that. Okay, thank you.
judges: Kozinski, Ikuta, Owens